UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
:
SUMMERWIND WEST CONDOMINIUM OWNERS :
ASSOCIATION INC.,                                    :
:
Plaintiff,                      :
:
-v-                                    :            22 Civ. 3165 (JPC)
:
MT. HAWLEY INSURANCE COMPANY and        :            OPINION AND ORDER
SYNDICATE 1458 AT LLOYD'S OF LONDON,     :
:
Defendants.                     :
:
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In September 2020, Hurricane Sally damaged a condominium building in Florida owned
by Plaintiff Summerwind West Condominium Owners Association ("Summerwind").   In the
aftermath of the storm, Summerwind filed a claim with its insurers, Defendants Mt. Hawley
Insurance Company and Syndicate 1458 at Lloyd's of London (collectively, "Mt. Hawley").  This
breach of contract action follows Mt. Hawley's denial of that claim.

Mt. Hawley now moves for summary judgment, arguing that the insurance policy is void
due to Summerwind's misrepresentations, that Summerwind is not entitled to replacement cost
coverage under the policy, and that Summerwind is not entitled to attorneys' fees.  Mt. Hawley
also requests dismissal of the case as a sanction for Summerwind's alleged fraud on the Court.  For
the reasons provided herein, the Court grants Mt. Hawley's motion with respect to Summerwind's
claim for attorneys' fees and denies the motion in all other respects.

## I. Background

**A.    Facts[1]**

Summerwind is a Florida corporation that operates three adjacent condominium buildings in Santa Rosa County, Florida.  Dkt. 1-3 at 6-10 ("Compl.") ¶ 3; Pl. 56.1 Stmt. ¶ 2.  One of those buildings, Summerwind West Condominium (the "Property"), was insured from August 2020 to August 2021 under a wind insurance policy issued by Mt. Hawley (the "Policy").  Lansden Decl. ¶ 6; Campen Decl., Exh. 1 ("Policy"); Pl. 56.1 Stmt. ¶¶ 1-2.  The Policy contains a "Concealment, Misrepresentation, or Fraud" clause which states as follows:

> The Policy is Void in any case of fraud by [the insured] as it relates to this Coverage at any time.  It is also void if you or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning this policy, the Covered Property, your interest in the Covered Property, or a claim under this policy.

Policy at 17[2]; Pl. 56.1 Stmt. ¶ 5.  The Policy also contains the following "Valuation" and "Loss Payment" provisions under its "Windstorm or Hail Policy" and its "Ordinance or Law Coverage":

WINDSTORM OR HAIL POLICY

. . .

---

[1]  The facts relied on throughout this Opinion and Order are considered in the light most favorable to Summerwind and are taken from Summerwind's and Mt. Hawley's statements of undisputed material facts submitted pursuant to Local Civil Rule 56.1(a), Dkts. 62, 66 ("Pl. 56.1 Stmt."), as well as the declarations filed in support of and in opposition to Mt. Hawley's motion for summary judgment and the exhibits attached to those declarations, Dkts. 64 ("Campen Decl."), 65 ("Smith Decl."), 68 ("Lansden Decl."), 69 ("Kurian Decl.").  The Court cites only to Summerwind's Rule 56.1 Statement where it does not dispute the referenced fact in Mt. Hawley's Rule 56.1 Statement or otherwise disputes only the inferences that can be drawn from the fact. The parties filed different deposition transcript excerpts from the same deponents, to which the Court will refer collectively: (1) Smith Decl., Exh. 3, and Kurian Decl., Exh. 4, collectively, "Derzis Dep. Tr."; (2) Smith Decl., Exh. 4, and Kurian Decl., Exh. 5, collectively, "Malone Dep. Tr."; and (3) Smith Decl., Exh. 13, and Kurian Decl., Exh. 6, collectively, "Cavinder Dep. Tr."

[2] The Court cites to the Policy using the ECF-generated page number.

9. LOSS CONDITIONS

. . .

H. Valuation

We will determine the value of Covered Property in the event of loss or damage as follows:

. . .

2. If Replacement Cost (without deduction for depreciation) is designated in conjunction with a specific coverage on the Declarations Page, we will pay the cost of building repairs or replacement for that designated coverage.

. . .

Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced. You may make a claim for actual cost value before repair or replacement takes place, and within 180 days after the loss for the replacement cost. Repair or replacement must take place within 180 days after the loss in order for replacement cost valuation to apply.

. . .

ORDINANCE OR LAW COVERAGE

. . .

F. Loss Payment

. . .

4. Under coverage C – Increased Cost Of Construction Coverage:

a.      We will not pay:

(1) Until the property is actually repaired or replaced, at the same or another premises; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

Policy at 8, 12, 15, 21-23; Pl. 56.1 Stmt. ¶ 24.

3

During the relevant time period, the Property was managed by Anne Malone of Virtuous Management Group.  Pl. 56.1 Stmt. ¶ 3.  On July 1, 2020, about two-and-one-half months before Hurricane Sally, Malone emailed Matt Cavinder of Cavinder Elevator Company stating: "I manage 3 high rise condominiums in Navarre, FL and all elevator units are declining considerably and are past their life expectancy.  They were installed in 2019/2000 [sic] and took a significant hit when Hurricane Ivan hit in 2004.  The rust, door operators, control boards are all struggling from time to time, thus creating the need for me to begin to get proposals for modernizations, etc."  Smith Decl., Exh. 10 ("July 2020 Email") at 1; Pl. 56.1 Stmt. ¶ 13.  Minutes from a July 8, 2020, meeting of Summerwind's Board of Directors reflect that Malone was asked to "prepare [a] package for future repairs/replacement" of the roof, and that the Board was reviewing the elevators "for upgrades/modernization."  Campen Decl., Exh. 9 at 2 (meeting minutes from July 8, 2020); Pl. 56.1 Stmt. ¶ 12.  In June or July 2020, Cavinder prepared modernization proposals for the elevators at the Property and Summerwind's other two buildings and submitted a physical copy of the Property's elevator modernization proposal to Malone.  Cavinder Dep. Tr. at 23:7-22, 64:7-14.

On September 16, 2020, Hurricane Sally made landfall in northwest Florida, and soon thereafter, Summerwind filed an insurance claim under the Policy for property loss resulting from the storm.  Campen Decl., Exh. 2 (Summerwind's Property Loss Notice dated September 16, 2020); Pl. 56.1 Stmt. ¶ 4.  Summerwind then hired Altieri Insurance Consultants ("Altieri") as a public adjuster to assist with its insurance claim.  Malone Dep. Tr. at 46:8-14; Pl. 56.1 Stmt. ¶ 4.  As Summerwind repaired the Property, Malone sent Altieri invoices from contractors so Altieri could submit an estimate of damages to Mt. Hawley.  Malone Dep. Tr. at 46:15-48:20; Pl. 56.1 Stmt. ¶ 4.  On October 21, 2020, Malone emailed Cavinder with the subject line "Elevator bid," asking him to "send that . . . but change the date to today.  Trying to push it under hurricane claim."

4

Smith Decl., Exh. 11 ("October 2020 Email") at 3; Pl. 56.1 Stmt. ¶ 16.  Then on November 17, 2020, Malone forwarded to Altieri the updated elevator bid from Cavinder for Altieri to include in its damages estimate.  October 2020 Email at 1; Pl. 56.1 Stmt. ¶ 16.

Mt. Hawley denied Summerwind's claim for the Property on December 11, 2020.  Campen Decl., Exh. 5 ("December 2020 Coverage Letter"); Pl. 56.1 Stmt. ¶ 7.  The denial letter acknowledged that the Property experienced "significant water intrusion," but explained that Mt. Hawley's engineer determined that there was "no storm-related damage to the roofing, no storm-related damage to the exterior cladding that resulted in water intrusion, and no storm-related damage to the doors or window."  December 2020 Coverage Letter at 2.  As such, Mt. Hawley explained, "there were no storm-created openings that allowed water intrusion into the building," which meant that the "water intrusion [was] not a result of any openings created by the landfall of Hurricane Sally" but "a result of wind-driven rain."  *Id.* at 2-3.

On January 11, 2021, Altieri sent Mt. Hawley a letter disagreeing with Mt. Hawley's coverage decision, stating that extensive storm-created damage to the roofs, windows, and doors was documented, and requesting a $1,000,000 advance claim payment because Summerwind "ha[d] been incurring emergency expenses including but not limited to . . . $514,959 for elevator repairs from Cavinder Elevator Company."  Campen Decl., Exh. 6 at MTH-000832-34[3]; Pl. 56.1 Stmt. ¶ 8.  In a letter dated March 24, 2021, Mt. Hawley reaffirmed its claim decision following a reinspection of the Property.  Campen Decl., Exh. 7 ("March 2021 Coverage Letter); Pl. 56.1 Stmt. ¶ 9.  "As part of [its] effort to further address all of the new information," Mt. Hawley also requested "additional information regarding the history of the building" and its pre-storm

---

[3] Altieri's January 11, 2021, letter to Mt. Hawley is attached as Exhibit 6 to Campen's Declaration in three parts, *see* Dkts. 64-5, 64-6, 64-7, so the Court uses the Bates numbering for ease of reference.

condition, including any estimates, bids, appraisals, or invoices from any consultant or contractor related to maintenance or repairs to the Property prior to the storm.  March 2021 Coverage Letter at 3-4; Pl. 56.1 Stmt. ¶ 9.

### B.    Procedural History

In August 2021, Summerwind commenced this action against Mt. Hawley in Florida state court, asserting a breach of contract claim arising from the denial of coverage for the Property. Within the next month, Mt. Hawley removed the action to the United States District Court for the Northern District of Florida, Dkt. 1, and thereafter moved to transfer the case to this District pursuant to 28 U.S.C. § 1404, citing the Policy's forum-selection clause requiring that any litigation by Summerwind be initiated in New York, Dkt. 7.  On September 24, 2021, Mt. Hawley filed its Answer, in which it asserted thirteen affirmative defenses based on various coverage provisions and exclusions under the Policy.  *See* Dkt. 8.  On April 18, 2022, the action was transferred to this District and assigned to the undersigned.  Dkt. 20.  The Court granted Mt. Hawley's motion to amend its answer on December 1, 2023, Dkt. 48, and Mt. Hawley filed its amended answer on December 7, 2023, Dkt. 49.

On December 20, 2023, the Court granted the parties' joint request to reopen discovery related to Mt. Hawley's newly added affirmative defense invoking the Policy's "Concealment, Misrepresentation, or Fraud" clause, *see* Dkt. 49 at 9, and set a briefing schedule for post-discovery motions.  Dkt. 55.  Mt. Hawley moved for summary judgment on May 10, 2024.  Dkts. 61, 63 ("Motion").  Summerwind opposed the motion on May 31, 2024, Dkt. 67 ("Opposition"), and Mt. Hawley replied on June 14, 2024, Dkt. 70 ("Reply").

## II.  Legal Standard

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Jianjun Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In conducting this review, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in favor of the nonmoving party."  *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Jianjun Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted).  The non-movant must present more than a "scintilla of evidence" to survive summary judgment.  *Anderson*, 477 U.S. at 252. "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted."  *Brown v. Eli Lilly & Co.*,

654 F.3d 347, 358 (2d Cir. 2011) (quoting *Fed. Deposit Ins. Co. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

### III. Discussion

### A.    Violation of the "Concealment, Misrepresentation, or Fraud" Clause

Mt. Hawley first argues that it is entitled to summary judgment because Summerwind "intentionally concealed and misrepresented material facts concerning both the underlying insurance claim and its Property," which would void the Policy under the "Concealment, Misrepresentation, or Fraud" clause.  Motion at 16.  As mentioned above, the Policy provides that it is "[v]oid in any case of fraud by [Summerwind] as it relates to this Coverage at any time," and that "[i]t is also void if [Summerwind] or any other insured, at any time, intentionally conceals or misrepresents a material fact concerning this policy, the Covered Property, [Summerwind's] interest in the Covered Property, or a claim under this policy."  Policy at 17.

Under New York law, an insurer may void a policy for concealment, misrepresentation, or fraud if it shows that the insured willfully made a false and material statement in a proof of loss statement or in a statement made under oath.[4]  *Fine v. Bellefonte Underwriters Ins. Co.*, 758 F.2d 50, 52 (2d Cir. 1985) (citing *Deitsch Textiles, Inc. v. N.Y. Prop. Ins. Underwriting Ass'n*, 468 N.E.2d 669 (N.Y. 1984)); *accord Mon Chong Loong Trading Corp. v. Travelers Excess & Surplus Lines Co.*, No. 12 Civ. 6509 (CM), 2014 WL 406542, at *1 (S.D.N.Y. Jan. 30, 2014).  To prevail on summary judgment, "'[t]he insurer must prove fraud by clear and convincing evidence.'"

---

[4] The Policy is governed by New York law.  *See* Policy at 39 ("All matters arising hereunder including questions related to the validity, interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules).").  And the parties agree that New York law applies.  *See* Motion at 11-13 (arguing that "the substantive law of New York governs the parties' claims and defenses in this lawsuit"); Opposition at 5 ("Plaintiff does not dispute that New York law applies to this dispute . . . .").

*Admiral Indem. Co. v. Bouley Int'l Holding, LLC*, No. 02 Civ. 9696 (HB), 2003 WL 22682273, at *4 (S.D.N.Y. Nov. 13, 2003) (quoting *Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 639 (2d Cir. 1995)).  As part of this showing, "the insurer must prove that the insured concealed material facts *with an intent to defraud*," "even where a misrepresentation/fraud clause like the one here at issue is involved."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 279 F. Supp. 2d 235, 241 (S.D.N.Y. 2003) (citing *Jonari Mgmt. Corp. v. St. Paul Fire & Marine Ins. Co.*, 448 N.E.2d 427, 431 (N.Y. 1983)), *aff'd as modified*, 411 F.3d 384 (2d Cir. 2005).  "Although actual intent to defraud is rarely sufficiently proven to warrant summary judgment, summary judgment may be granted where no reasonable trier of fact could infer anything other than knowing intent to defraud."  *Scott v. AIG Prop. Cas. Co.*, 417 F. Supp. 3d 329, 347 (S.D.N.Y. 2019) (internal quotation marks omitted); *see also Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201-02 (2d Cir. 1991) ("Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind.").  Courts have found intent to defraud to be established as a matter of law where, among other circumstances, (a) "the evidence of a claimant's knowledge of facts which entirely undermine the statements he made to his insurer is undisputed," *Scott*, 417 F. Supp. 3d at 348 (collecting cases), (b) the insured admittedly made "blatantly contradictory statements" to the insurer, and the elaborate nature of the falsehoods "undermine any possibility that the contradictions . . . were the result of anything other than [the insured's] willful disregard for the truth," *id.* at 349-50 (collecting cases), or (c) "it is shown that the difference between the amounts claimed in the proof of loss and those actually proved to have been destroyed are grossly disparate and the explanation tendered is so unreasonable or fantastic that it is inescapable that fraud has occurred," *Saks & Co. v. Cont'l Ins. Co.*, 242 N.E.2d 833, 835 (N.Y. 1968).

Mt. Hawley argues that Summerwind "falsely concealed and misrepresented the pre-storm elevator bid and the pre-storm condition of the elevators both before and during this litigation" for "the express purpose of fooling Mt. Hawley into believing that the elevator replacement bid was necessitated by Hurricane Sally and created after the storm to specifically document storm damage."  Motion at 16-17.  Mt. Hawley offers up four pieces of evidence that it says, taken together, qualify as "clear and convincing evidence" of Summerwind's fraudulent intent: (1) Malone's instruction to Cavinder to "change the date" of the elevator bid so she could "push it under the insurance claim," (2) the contrast between Malone's deposition testimony and her initial email to Cavinder with respect to the pre-storm state of the Property's elevators, (3) Summerwind's failure to produce Cavinder's pre-storm bid, and (4) Summerwind's belated disclosure of Malone's initial email to Cavinder. *Id.* at 16-18.  Considering the record as a whole, however, the Court cannot conclude that "no reasonable trier of fact could infer anything other than [Summerwind's] knowing intent to defraud" from its behavior before and during this litigation. *Scott*, 417 F. Supp. 3d at 347.

According to Mt. Hawley, the most damning piece of evidence is Malone's October 21, 2020, email to Cavinder which had "Elevator bid" as the subject line and read: "Can you send that for the inn but change the date to today.  Trying to push it under hurricane claim."  October 2020 Email at 3;  Pl. 56.1 Stmt. ¶ 16.  Mt. Hawley argues that Summerwind "specifically instructed Cavinder to doctor the date of a pre-storm bid, which was not created to repair storm damage, to trick Mt. Hawley into believing it was created to assess and repair storm damage as part of its insurance claim."  Reply at 1.  This alone violated the "Concealment, Misrepresentation, or Fraud" clause, says Mt. Hawley, "because the bid was represented to Mt. Hawley as a bid to repair storm damage when, in fact, it was created prior to the storm based upon the pre-storm condition of the

elevators." *Id.* at 2.  Just because Summerwind originally intended to use the bid to replace the elevators upon their obsolescence but then sought to rely on that bid when seeking to replace the elevators post-Hurricane Sally, however, does not mean that Summerwind fraudulently misrepresented the nature of the elevator damage resulting from the storm.

Summerwind solicited the original elevator bid from Cavinder in order to adequately plan and budget for a future expense.  Florida law requires Summerwind to create an annual budget, which "must include reserve accounts for capital expenditures" and items that have a "deferred maintenance expense or replacement cost that exceeds $10,000."    Fla. Stat. Ann. § 718.112(2)(f)(2)(a).  The statute further specifies that the "amount to be reserved must be computed using a formula based upon estimated remaining useful life and estimated replacement cost or deferred maintenance expense of the reserve item." *Id.*  As property manager, Malone was responsible for preparing Summerwind's annual budget.  Malone Dep. Tr. at 19:22-23.  In mid-2020, Malone requested from Cavinder elevator modernization proposals for Summerwind's three condominium buildings so she could determine how to fund Summerwind's reserve accounts in preparation for future elevator-related expenditures.  July 2020 Email at 1; Malone Dep. Tr. at 133:5-15 (explaining that she asked Cavinder for that original elevator bid because she was "look[ing] at [Summerwind's] budgets to see what kind of expenses . . . [to] put away for the big type of products.  Like the roof, the elevators, et cetera to make sure that they were, in fact, . . . putting funds in the reserves for those things."); Cavinder Dep. Tr. at 21:8-10 ("[Malone] asked me to look at all three [buildings] and give her a reserve study so that she could prepare the board over budget."), 23:7-12 ("Q. . . .  Is it correct that Anne Malone asked you to do modernization proposals for all three buildings prior to Hurricane Sally?  A.  Yes, she did, for her reserve study."), 31:13-20 (explaining that he submitted a bid because "it was at the request of Anne Malone.  She

was doing her reserve studies so her budget was in place for homeowners to start . . . saving money for these replacements in the future."); Pl. 56.1 Stmt. ¶ 13. Summerwind knew that it was "not going to have enough money in the reserves at that time to replace the elevators," but it wanted to "keep [the condominium owners] updated" and "start saving accordingly." Derzis Dep. Tr. at 123:17-25.

Before the storm, Summerwind did not intend to immediately replace the elevators upon receiving the bid; it solicited the estimate from Cavinder only to plan for a future expense. *See* Malone Dep. Tr. at 114:13-16 ("Q. When you brought this up to the board [before the storm], did you feel that there needed to be a modernization completed on the elevators within one year? A. Not at that time."), 116:18-117:2 (explaining that she "asked [Cavinder] for an estimate" to replace all building elevators before the storm). While the elevators "were probably [in] average to . . . poor condition" at the time of Cavinder's initial inspections, Cavinder Dep. Tr. at 29:14-18, Malone and Stephanie Derzis, the president of Summerwind's board between 2016 and October 2021, both testified that Summerwind was not experiencing any major issues with the elevators that warranted their immediate replacement, Malone Dep. Tr. at 95:21-96:3 (explaining that there were no "major" problems with the elevators before Hurricane Sally, only "minor maintenance" issues like a "call button out" or a "[l]ight out"); Derzis Dep. Tr. at 121:5-22 (explaining that "there wasn't any major issues going on with [the] elevators," only minor issues like "door[s] sticking"). Upon reviewing the elevators, Cavinder determined that there was no immediate need for elevator replacement, as he estimated that they had at least five to seven more years of useful life left to them. Cavinder Dep. Tr. at 30:17-23; *see also id.* at 31:7-12 ("We never said the [elevators] had to be replaced prior to Hurricane Sally. Q. Did you tell Anne Malone or anyone else that those elevators . . . needed to be modernized prior to Hurricane Sally? A. No, we did not."); Derzis

12

Dep. Tr. at 123:16-17 ("We were told that the elevators had 7 to 10 years of life left."). Summerwind relayed this message to the condominium owners, informing them that the elevators would need to be replaced in "seven to eight years, [or] somewhere around there." Derzis Dep. Tr. at 122:1-4.

After Hurricane Sally struck the Property, the elevator room was "fil[l]ed with water" and "[t]he elevators weren't working." *Id.* at 122:10-12. Summerwind then called to have someone inspect the elevators, and the elevator company informed Summerwind that "[t]he storm has really taken a beating on the[] elevators," and that the elevators were "going to need to be replaced"—in short, Summerwind "[did not] have that 7 to 10 years anymore." *Id.* at 122:12-16, 124:7-11. It was then that Malone asked Cavinder, via email on October 21, 2020, for an updated elevator bid so she could submit the elevator damage estimate to Mt. Hawley. *See* October 2020 Email at 3; Pl. 56.1 Stmt. ¶ 16. Cavinder accordingly submitted a revised elevator bid, changing only the date of the bid and the price for the work, as his earlier quote held for only thirty days. Cavinder Dep. Tr. at 24:10-19, 49:4-15.

Viewing the record as a whole and in the light most favorable to Summerwind, the Court cannot conclude that "no reasonable trier of fact could infer anything other than [Summerwind's] knowing intent to defraud" from Malone's October 21, 2020, email asking Cavinder to change the date of the bid. *Scott*, 417 F. Supp. 3d at 347. Cavinder explained that elevator "modernization takes place either through obsolescence or severe damage." Cavinder Dep. Tr. at 30:9-10. As described above, Summerwind originally contacted Cavinder to accurately estimate the cost of replacing the elevators, so that Summerwind could start funding its reserve accounts in preparation for that future expense. Summerwind eventually would need to replace or modernize the elevators upon their obsolescence, which was still several years away, but given the magnitude of that

expense and Summerwind's obligations under Florida law, Summerwind needed to start budgeting for the forthcoming capital expenditure. Once Hurricane Sally struck the Property and filled its elevator room with water, Summerwind's timeline for elevator modernization was accelerated drastically. The elevators no longer had several years of life left; the severe damage from the storm required an immediate replacement or modernization of the elevators. It was at that point that Malone asked Cavinder to update his original modernization bid with current pricing, presumably instead of asking Cavinder to create a new one from scratch. Summerwind used Cavinder's pre-storm bid "as a bid to repair storm damage" because the pre-storm bid was one to replace the elevators, and the storm damage necessitated immediate replacement. That Summerwind solicited a bid to prepare for a future expense, but then used that bid (with an updated price) to seek coverage to replace the elevators upon their severe damage from Hurricane Sally, does not mean that Summerwind necessarily misrepresented the nature of the elevator damage. In other words, Summerwind's intent to replace the elevators at some point in the future and its actions taken in furtherance of that plan do not change the fact that the storm damage to the elevators warranted their immediate replacement. And if the storm damage rendered the elevators inoperable, it does not necessarily follow that Summerwind intended to defraud Mt. Hawley by including in its claim the cost to replace the elevators. In all, a reasonable juror could conclude that Malone did not ask Cavinder to update the bid—and Summerwind did not then submit the updated bid along with its insurance claim—with an intent to defraud Mt. Hawley.

This conclusion does not change when, as Mt. Hawley argues, Malone's October 2020 email to Cavinder is considered alongside the contrast between Malone's deposition testimony and her initial email to Cavinder describing the pre-storm state of the elevators, Summerwind's failure to produce Cavinder's pre-storm bid, and Summerwind's belated disclosure of Malone's initial

email to Cavinder.  Motion at 17-18.  In Malone's July 2020 email to Cavinder, she described the elevators as "declining considerably" and "past their life expectancy."  July 2020 Email at 1.  As she related to Cavinder, the "rust, door operators, [and] control boards [were] all struggling from time to time, thus creating the need for [her] to begin to get proposals for modernizations."  *Id.* During her deposition, Malone testified that there were no "major" problems with the elevators before Hurricane Sally, only "minor maintenance" issues like a "call button out" or a "[l]ight out." Malone Dep. Tr. at 95:21-96:3.  Mt. Hawley claims that Malone's "false deposition testimony that the elevators were not experiencing any significant problems prior to the storm" is additional evidence of Summerwind's intent to defraud.  Motion at 18; *see id.* at 17 ("Malone testified untruthfully in her deposition and swore that the elevators had no major problems prior to Hurricane Sally and that she was merely soliciting replacement bids for budgetary purposes.  This is directly contradicted by the withheld emails Mt. Hawley subsequently uncovered.").  Contrary to Mt. Hawley's arguments, however, at most there is a question of fact as to the state of the elevators before Hurricane Sally hit the building.  *Cf. Jeffreys*, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). Malone's July 2020 email could be read to suggest a higher level of disrepair than her later deposition testimony might suggest, but Cavinder and Derzis both also independently testified that Summerwind was not experiencing any major issues with the elevators that would warrant their immediate replacement.  *See* Cavinder Dep. Tr. at 29:14-18 (describing the elevators as in "probably [in] average to . . . poor condition"), 30:17-23 (explaining that the elevators "were within . . . [a] five- to seven-year window" for replacement); Derzis Dep. Tr. at 121:5-22 (explaining that "there wasn't any major issues going on with [the] elevators," only minor issues like "door[s]

sticking"). In fact, at his deposition, Cavinder testified that he disagreed with Malone's description in her July 2020 email of the state of the elevators. Cavinder Dep. Tr. at 52:3-11. Any discrepancy between Malone's July 2020 email and her deposition testimony is not alone clear and convincing evidence of Summerwind's intent to defraud Mt. Hawley, nor is it conclusive of Summerwind's fraudulent intent when considered in conjunction with any other piece of evidence identified by Mt. Hawley.

Similarly, Summerwind's failure to produce Cavinder's initial elevator bid does not alone, or in combination with anything else, demonstrate fraudulent intent on behalf of Summerwind by clear and convincing evidence. The record, viewed in the light most favorable to Summerwind, does not support Mt. Hawley's narrative of Summerwind's intentional "concealment of the pre-storm replacement bids." Motion at 18. As mentioned, Cavinder prepared his initial bid for the elevator modernization in June or July of 2020. Cavinder Dep. Tr. at 23:7-22. He subsequently submitted a hard copy of that bid to Malone. *Id.* at 64:7-14. Once Malone asked Cavinder to update the bid, however, Cavinder edited the existing electronic file with the bid, overwriting the original version. *Id.* at 24:5-17; *see also id.* at 64:15-23 (explaining that he does not separately save every version of a bid when updating it). Mt. Hawley makes much of the fact that Summerwind has been unable to produce the pre-storm version of the elevator bid. *See* Motion at 7 ("The final piece of this dishonest plan is the mysterious disappearance of Cavinder's pre-storm bid."), 8-9 ("Of course, at the end of the day, it is now obvious why this incriminating pre-storm bid has conveniently disappeared and why it has consistently been withheld from production by everyone on Plaintiff's side of this case."); Smith Decl. ¶ 8 ("Neither Virtuous nor Cavinder has produced the pre-storm elevator replacement bid during discovery. Plaintiff's document production likewise did not include any pre-storm roof or elevator replacement bids."). Mt.

Hawley baldly asserts that "the earlier electronic version of the document would exist as an email attachment when the pre-storm bid was submitted to Anne Malone." Motion at 8. But Cavinder testified in his deposition that he "believe[d]" that he submitted the original bid to Malone "in person," Cavinder Dep. Tr. at 64:12-13, in which case Malone would have received only a hard copy of that bid. It therefore follows that Summerwind would only be able to produce the document if Malone retained that physical copy. A rational trier of fact could conclude that Summerwind did not fail to produce the pre-storm bid in an effort to defraud Mt. Hawley, but rather for the simple reason that the original version of the bid no longer exists, either electronically or physically. *Cf. Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 513 F. Supp. 2d 18, 21 (S.D.N.Y. 2007) ("The failure to keep records does not *per se* show willfulness or an intent to deceive.").

The final piece of the puzzle, according to Mt. Hawley, is Summerwind's belated disclosure of Malone's July 2020 email to Cavinder asking him to prepare a bid to replace the elevators. *See* Motion at 17-18 (arguing that Malone's October 2020 email constitutes "clear and convincing evidence that [Summerwind] concocted [a] fraudulent scheme" "especially . . . when paired with . . . [Summerwind's] concealment of the pre-storm emails to Cavinder asking him to prepare a pre-storm replacement bid"). Mt. Hawley claims that the July 2020 email "was not produced by [Summerwind] during the claim investigation or in response to Mt. Hawley's requests for production," Smith Decl. ¶ 6, and that Cavinder "did not produce this email (or any others) until after his deposition was rescheduled because he had conveniently neglected to produce his file," Deft. 56.1 Stmt. ¶ 13 n.1 (emphasis omitted). Yet, Mt. Hawley fails to point to anything in the record to suggest that Summerwind intentionally withheld any emails between Malone and Cavinder to further a fraudulent purpose. "In order to constitute fraud, there must be a willful

intent to defraud and not a mere mistake or oversight." *Sun Ins. Co. of N.Y. v. Hercules Sec. Unlimited, Inc.*, 605 N.Y.S.2d 767, 771 (2d Dep't 1993) (collecting cases).   A reasonable juror also could infer from the record, as presented to the Court, that Cavinder's belated disclosure of his emails with Malone was an inadvertent mistake, and not a product of an intent to defraud Mt. Hawley.

The cases cited by Mt. Hawley are readily distinguishable.  *See* Motion at 16-18 (relying on *Cimato v. State Farm Fire & Cas. Co.*, No. 16 Civ. 94A (SR) (RJA), 2020 WL 5260295 (W.D.N.Y. June 29, 2020), *report and recommendation adopted*, 2020 WL 5250504 (W.D.N.Y. Sept. 3, 2020)); Reply at 2-4 (relying on *Fernandez v. Phila. Indem. Ins. Co.*, No. 16 Civ. 2533 (JCM), 2018 WL 502709 (S.D.N.Y. Jan. 19, 2018)).   In *Cimato*, the insured testified in his deposition that he purchased replacement furniture for $15,225, when the furniture store's business records reflected that, a few weeks earlier, the insured had actually purchased the replacement furniture for $4,871.72.  *Cimato*, 2020 WL 5260295, at *6.  The $10,000 inflation of price raised "an inference of fraudulent intent," and the insured's excuse for such a gross disparity was that his Parkinson's disease medication negatively impacted his memory at the time of his deposition.  *Id.* The court found the insured's fraudulent intent to be established as a matter of law because "'the difference between the amounts claimed in the proof of loss and those actually proved to have been destroyed [were] grossly disparate and the explanation tendered [was] so unreasonable or fantastic that it [was] inescapable that fraud ha[d] occurred.'"  *Id.* (quoting *Saks & Co.*, 242 N.E.2d at 835).  Here, by contrast, Mt. Hawley shows no gross disparity between the amounts claimed by Summerwind and the actual damage, raising no inference of fraudulent intent, and Summerwind's explanation of the evidence that Mt. Hawley does point to is far from "so unreasonable or fantastic" as to make the determination of fraud "inescapable."  In *Fernandez*, the insured conceded that he

"submitted invoices purporting to be from [a mechanic] that he 'prepared' after the fact using 'estimates.'"  2018 WL 502709, at *7; *see also id.* ("Plaintiff repeatedly submitted the 'made up' documents in an effort to recover under the Policy.").  And the insured "seem[ed] to concede that he acted purposefully because [the insurer] 'threatened not to pay the claim' unless [he] submitted the documentation."  *Id.*; *see also id.* (quoting the insured's testimony: "I admit that I did something foolish.").  Here, however, there are no such concessions by Summerwind, and Mt. Hawley has not shown by clear and convincing evidence that the post-storm elevator bid was not a bona fide invoice submitted by Cavinder to Summerwind.

"[T]he bar for granting summary judgment on the basis of fraud is a high one . . . ."  *Scott*, 417 F. Supp. 3d at 347.  Ultimately, viewing the evidence in the light most favorable to Summerwind, the Court cannot conclude that Mt. Hawley has met its heavy burden of demonstrating fraudulent intent by clear and convincing evidence.  Mt. Hawley has not submitted undisputed evidence of Summerwind's "knowledge of facts which entirely undermine the statement [it] made" to Mt. Hawley, *id.* at 348, nor has Summerwind made "blatantly contradictory statements" to Mt. Hawley, the detailed and elaborate nature of which "undermine any possibility that the contradictions . . . were the result of anything other than [Summerwind's] willful disregard for the truth," *id.* at 349-50.  This is not to say that the evidence Mt. Hawley has mustered is not relevant or not probative of Summerwind's intent, only that the evidence does not itself rise to the clear and convincing standard.  Because Summerwind's intent to defraud Mt. Hawley therefore presents a question of fact, the Court denies Mt. Hawley's motion for summary judgment with respect to the Policy's "Concealment, Misrepresentation, or Fraud" clause.

**B.      Replacement and Code Compliance Costs**

Next, Mt. Hawley argues that, as a matter of law, Summerwind "is not entitled to replacement costs or increased costs of construction due to the enforcement of any law or ordinance."  Motion at 20.  As mentioned, the Policy limits Summerwind's recovery in the event that the damaged property is not actually repaired or replaced.  Under the "Valuation" clause, the Policy provides that "[r]eplacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced," which "must take place within 180 days after the loss."  Policy at 15.  And under the "Loss Payment" clause, Mt. Hawley "will not pay" for repairs or replacements necessary to comply with ordinances or laws "[u]ntil the property is actually repaired or replaced" and "[u]nless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years."  *Id.* at 22-23.  Summerwind does not dispute that it "has not replaced the stucco cladding, windows, or sliding glass doors of the building."  Pl. 56.1 Stmt. ¶ 23.  Under the plain terms of the Policy, therefore, it would appear that Summerwind is not entitled to recover the cost of such repairs or replacements.  *See Exec. Plaza, LLC v. Peerless Ins. Co.*, 717 F.3d 114, 117 (2d Cir. 2013) ("[A]ctual repair of the property is a condition precedent to recovering on a replacement cost basis." (collecting cases from the Appellate Division of the New York State Supreme Court)).

Summerwind argues that, despite not replacing the cladding, windows, or sliding doors at the Property, it is "still entitled to Replacement Cash Value" because Mt. Hawley prevented Summerwind from replacing the damaged property by denying the insurance claim.  Opposition at 18-19.  "Without such insurance proceeds," Summerwind argues, it "could not finance the needed repairs."  *Id.* at 19; *see* Derzis Dep. Tr. at 102:16-25 ("Q. . . .  I asked why the window issues haven't been . . . replaced, and you weren't sure about that?  A.  Well, I mean, we've just

had everything else.  We have elevators that weren't safe.  We had to get those done.  We had roofs that [were] leaking.  We had to get those done.  And at some point the money is not there.  I mean, we've already assessed these owners I can't tell you how much, and at some point, I mean, the well runs dry.").

In general, "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition."  *A.H.A. Gen. Const., Inc. v. N.Y.C. Hous. Auth.*, 699 N.E.2d 368, 374 (N.Y. 1998) (internal quotation marks omitted).  Where insureds "were refused any monies under the insurance contract," and as a result are "unable to replace their [property]," they may be "excuse[d] . . . from performance of the replacement condition" because the insurer's conduct made it impossible to fulfill the condition precedent.  *Zaitchick v. Am. Motorists Ins. Co.*, 554 F. Supp. 209, 217 (S.D.N.Y. 1982), *aff'd*, 742 F.2d 1441 (2d Cir. 1983); *see Ram Krishana Inc. v. Mt. Hawley Ins. Co.*, No. 22 Civ. 3803 (JLR), 2025 WL 371016, at *11 (S.D.N.Y. Feb. 3, 2025) ("[C]ourts have excused the insured from the condition precedent of completing repairs to recover replacement costs . . . where the insurer either failed to pay *any* of the actual cash value or significantly underpaid the actual cash value."); *Matos v. Peerless Ins. Co.*, No. 14 Civ 120 (SR), 2017 WL 444687, at *10-11 (W.D.N.Y. Feb. 2, 2017) (applying *Zaitchick* to deny the injurer's motion for summary judgment with respect to replacement cost coverage and observing that "there is no precedent to suggest that plaintiff is under an obligation to expend personal funds to satisfy a condition precedent to obtaining replacement cost coverage where the insurance company is challenging coverage in the first instance"); *Woodworth v. Erie Ins. Co.*, 743 F. Supp. 2d 201, 218 n.14 (W.D.N.Y. 2010) ("[A] complete failure to pay actual cash value, which prevents the insured from rebuilding or replacing, may excuse the insured from performing the condition precedent of rebuilding or replacing."

(citing *Zaitchick*, 554 F. Supp. at 217)), *reconsidered in part*, No. 05 Civ. 6344 (CJS), 2011 WL 98494 (W.D.N.Y. Jan. 12, 2011); *Covia P'ship v. Sharp Travel Serv.*, No. 92 Civ. 2951 (MBM), 1994 WL 132112, at *5 (S.D.N.Y. Apr. 8, 1994) ("Thus, an insurance company has been held liable to an insured, even though the insured failed to fulfill the contractual precondition of replacing the property, because the insurer hindered the insured's compliance by initially denying liability.").

Here, there is a question of fact as to whether Summerwind was prevented from replacing the cladding, windows, or sliding doors by virtue of Mt. Hawley's refusal to pay Summerwind any proceeds from the Policy. *See* December 2020 Coverage Letter (denying coverage); March 2021 Coverage Letter (reaffirming denial). Summerwind presented some evidence that it was financially unable to pay for the repairs, *see* Derzis Dep. Tr. at 102:16-25—evidence which Mt. Hawley does not address, let alone rebut, in its Reply, *see generally* Reply. As a result, the Court cannot conclude, as a matter of law, that Summerwind is not entitled to the replacement and code compliance costs, and Mt. Hawley's motion for summary judgment as to those costs therefore is denied. *See Woodworth*, 2011 WL 98494, at *3 (denying the insurer's motion seeking a "ruling that [the insureds] are barred from obtaining replacement cost as a matter of law" because there were "issues of fact as to whether [the insurer] prevented [the insureds] from rebuilding, by failing to pay them the correct amount for actual cash value"); *Vic Char Realty, Inc. v. All. Plus, Inc.*, 810 N.Y.S.2d 152, 154 (1st Dep't 2006) (affirming denial of summary judgment because "[i]ssues of fact also exist[ed] as to whether [the insured] was prevented from fulfilling the condition precedent of repair or replacement").

C.    **Attorneys' Fees**

Summerwind asserts in the Complaint that it "is entitled to and does seek recovery of attorneys['] fees and costs pursuant to Sections 626.9373, 627.428, 57.104, and/or 57.041, Florida Statutes."  Compl. ¶ 23.  In its motion, Mt. Hawley argues that the "choice of law provision in the Policy . . . [is] sufficiently broad to encompass [Summerwind's] extracontractual claim for attorney's fees under Florida law," and that it is entitled to judgment as a matter of law because the "claim for attorney's fees under . . . the Florida Statutes [is] not cognizable under New York law."  Motion at 18-19.  Summerwind did not respond to this argument in its opposition brief and arguably has forfeited any claim it may have asserted for attorneys' fees under Florida law.  *See Banyan v. Sikorski*, No. 17 Civ. 4942 (LJL), 2021 WL 2156226, at *2 (S.D.N.Y. May 27, 2021) (holding that a plaintiff's "failure to respond to arguments set forth in a moving party's [summary judgment] brief is an adequate ground for a Court to deem the claim abandoned"); *Simon v. City of New York*, No. 14 Civ. 8391 (JMF), 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015) (collecting cases holding that a plaintiff forfeits claims when it fails to address a defendant's argument on a motion, regardless of its merit).

Regardless of whether Summerwind has forfeited its request for attorneys' fees, that request fails as pleaded.  The Policy's broad choice-of-law provision states that "[a]ll matters arising hereunder including questions related to the validity, interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules)."  Policy at 39; *see* Opposition at 5 (explaining that "Plaintiff does not dispute that New York law applies to this dispute" and that the Policy's "choice-of-law provision governs the contractual relationship between the parties, the scope of which is limited by the express terms of the agreement").  Such language has been found

to reach a party's request for attorneys' fees.  *See, e.g, CBKZZ Inv. LLC v. Renaissance Re Syndicate 1458 Lloyds*, 22 Civ. 10672 (AS), 2024 WL 728890, at *3 (S.D.N.Y. Feb. 22, 2024). Summerwind cites no provision of New York law that justifies its recovery of attorneys' fees, instead relying only on inapplicable provisions of Florida law.  *See* Compl. ¶ 23.  Summerwind's claim for attorneys' fees therefore is dismissed.

**D.    Fraud on the Court**

Finally, in its summary judgment briefing, Mt. Hawley argues that this "case should be dismissed as a sanction because [Summerwind's] conduct constitutes fraud on the Court."  Motion at 22.  Mt. Hawley points to essentially the same conduct by Summerwind as it does to support its argument for judgment based on the Policy's "Concealment, Misrepresentation, or Fraud" clause. *Id.* at 23 (listing the belated production of Malone's July 2020 email to Cavinder, the discrepancy between the elevators' description in that email and Malone's testimony at her deposition, and Summerwind's failure to produce the pre-storm bid); *see supra* III.A.  For the same reasons as discussed above, Mt. Hawley has not demonstrated Summerwind's fraud on this Court by clear and convincing evidence.  *See Shangold v. Walt Disney Co.*, No. 03 Civ. 9522 (WHP), 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006) ("Fraud on the court must be established by clear and convincing evidence."), *aff'd*, 275 F. App'x 72 (2d Cir. 2008); *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("[A] fraud upon the court occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."); *see also Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) ("'[F]raud upon the court' as distinguished from fraud on an adverse party is limited to

fraud which seriously affects the integrity of the normal process of adjudication."). Accordingly, Mt. Hawley's motion for sanctions is denied.[5]

### IV. Conclusion

Mt. Hawley's motion for summary judgment is granted with respect to Summerwind's claim for attorneys' fees and is denied in all other respects. The Court also denies Mt. Hawley's motion for sanctions. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 61.

SO ORDERED.

Dated: March 3, 2025
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

---

[5] The parties' joint post-discovery status letter, in which they requested leave to file summary judgment motions and motions *in limine*, made no mention of Mt. Hawley's contemplated motion for sanctions. Dkt. 50. The Court endorsed only the parties' request to file summary judgment motions. Dkt. 51. Mt. Hawley thereafter never sought leave to file a motion for sanctions, nor did the Court otherwise authorize such a motion. *See* Individual Rules and Practices in Civil Cases 6.A ("Unless otherwise ordered by the Court, a party seeking to file a motion must submit a pre-motion letter . . . notifying the Court of its anticipated motion, summarizing the basis for the anticipate motion, and proposing a briefing schedule."). Mt. Hawley's "failure to comply with the Court's Individual Civil Rules provides an additional, independently sufficient basis to deny this portion of the Motion." *Nixon v. Source Digit., Inc.*, No. 23 Civ. 5218 (JPC), 2024 WL 5202514, at *11 (S.D.N.Y. Dec. 23, 2024).